Argued and submitted January 6, accused suspended from the practice of law for 180 days, commencing 60 days from filing date of this decision November 9, 2000

In re Complaint as to the Conduct of

EDWARD J. BENETT,
*Accused.*

(OSB 96-90, 96-184; SC S34639)

14 P3d 66

Edward J. Benett, *pro se*, argued the cause and filed the briefs.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, a trial panel of the Disciplinary Board found that the accused violated Code of Professional Responsibility Disciplinary Rule (DR) 1-102(A)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation) while representing his client Moore and violated DR 2-106(A) (prohibiting excessive fees) and DR 9-101(C)(4) (requiring prompt return of client property) in dealing with his clients Chesney. The trial panel found that the accused had not violated DR 1-102(A)(3) in the Chesney matter. The trial panel suspended the accused for 120 days, with 30 days stayed. The Oregon State Bar (Bar) and the accused both sought review in this court. ORS 9.536(1); Bar Rule of Procedure (BR) 10.1 and BR 10.3. On *de novo* review, ORS 9.536(3); BR 10.6, we conclude that the accused committed the three violations that the trial panel found. We further conclude that he also violated DR 1-102(A)(3) in the Chesney matter. We impose a 180-day suspension.

## I.   FACTS

We find the following facts by clear and convincing evidence. BR 5.2.

### A.   *Moore*

■   In 1995, Moore agreed to purchase a car from CJC Auto Sales (CJC) for $9,995. He paid $1,000 down and took possession of the car. Moore intended to finance the remainder of the purchase price, but his financing was not approved. CJC repossessed the car, but did not refund Moore's $1,000 down payment. Moore hired the accused to assist in resolving the dispute, and CJC hired lawyer Davidson.

The accused filed a complaint against CJC on Moore's behalf, alleging fraud and unlawful trade practices. The accused sent Davidson a settlement offer of $3,000, payable by CJC in two installments of $1,500 each, which Davidson accepted on his client's behalf. In November 1995, Davidson sent the accused a mutual release, two $1,500 checks from CJC, and a stipulated judgment of dismissal. The release stated that Moore agreed to settle the matter for

$3,000 and that the release contained the parties' entire agreement. In December, the accused deposited the checks. Although the first check cleared the bank, the second did not. In January 1996, the accused notified Davidson that one of the $1,500 checks had been returned for insufficient funds. The accused threatened to file an action for breach of contract and treble damages.

Shortly thereafter, the bank notified the accused that the second check had cleared. Although the accused now had $3,000 from CJC, he did not inform Davidson of that fact. Davidson continued to believe that the bank had not honored the second $1,500 check. Consistent with that belief, Davidson wrote to the accused that CJC would pay $1,500 in three installments of $500. In January 1996, Davidson sent the accused $500. A week later, Davidson sent the accused $500 more. The accused then wrote Davidson acknowledging that Moore had been paid in full. At that time, however, the accused had received $4,000 from CJC.

When Davidson later discovered that the bank had paid CJC's previously dishonored check, he demanded the return of the $1,000 overpayment. In response, the accused wrote to Davidson, stating:

> "I regret the misunderstanding over our collection of $4,000 instead of $3,000 in settlement of our claims against your client. I had regarded your client's NSF checks as a breach of the original settlement agreement (dealing with the [unlawful trade practices act] claim), and his willingness to pay the additional money as an offer to settle additional claims under ORS 30.700 [since repealed, which provided a cause of action to recover damages for an insufficient funds check after a 30-day notice period]. If you had prepared a writing reflecting that, I would have signed it."

The accused refused to return the $1,000. Davidson promptly complained to the Bar that the accused improperly had converted funds belonging to CJC. The Bar filed a complaint alleging that the accused's conduct in the Moore matter violated DR 1-102(A)(3).

## B. *The Chesneys*

The Chesneys purchased a motor home that they claimed was defective. They retained the accused and, in 1996, he settled the case and deposited the settlement funds in his trust account. In February 1996, the Chesneys complained to the accused that they had not received all of their settlement funds. They also disputed the amount of the accused's fee and whether his fee statements were correct. The accused withheld both the disputed and the undisputed portions of the settlement funds that remained in the trust account. In May 1996, the Chesneys terminated their representation by the accused and asked that he send them the undisputed portion of those funds. He did not do so.

The Chesneys then retained another lawyer, Quenelle, to represent them in their dispute with the accused. Quenelle asked the accused to send the Chesneys the undisputed portion of the settlement funds. The accused refused to do so, contending that the undisputed portion of the funds had not yet been calculated. The accused then sent the Chesneys a detailed bill for his services and expenses as of August 7, 1996. In that bill, the accused sought compensation for time he had spent disputing the bill with the Chesneys. At that time, the accused also sent the Chesneys $6,885 in undisputed funds.

In October 1996, Quenelle requested the Chesneys' file from the accused. The accused responded by questioning whether Quenelle was the Chesneys' lawyer (for the purpose of requesting the file) and whether Quenelle had a release for the file from the Chesneys. The accused also asserted that the Chesneys already had copies of everything in the file. Quenelle provided the accused with a release and again demanded the file. Later, Quenelle sent a letter to the accused stating that Quenelle had made arrangements to have the file picked up, copied, and returned at the Chesneys' expense. The accused responded that he was too busy with other cases. He also refused to make the file available on the ground that Quenelle was being "discourteous."

In July 1997, a lawyer representing the accused sent Quenelle a check for $1,575, purporting to correct "errors in the billing statement." The letter accompanying the check

stated that the Chesneys still owed the accused $10,441 in fees and asserted an attorney's lien on the Chesneys' file. The letter stated that the accused would agree to copy the file if the Chesneys agreed that he would not be waiving his attorney's lien by doing so. That offer was made nine months after Quenelle first requested the Chesneys' file.

Sometime in 1996, the accused contacted the Bar about his dispute with the Chesneys. The precise nature and extent of the communication between the accused and the Bar is not explained in the record of this case. However, in August 1997, the accused wrote to an investigator for a Local Professional Responsibility Committee:

> "I now understand that it was improper for me to bill for much of the time between April 3 and August 7, 1997 [sic] and I have therefore released an additional $1,575 to the Chesneys as 'undisputed funds.' Even though my withholding of those funds was not done for the purpose of charging an excessive fee, I admit that my doing so under the circumstances did in fact constitute 'charging an excessive fee' under DR 2-106(A).
>
> "* * * * *
>
> "For the same reasons explained in my answer * * * above, I admit also violating DR 9-101(C)(4) by not releasing funds for certain work performed by me between April 3 and August 7, 1996. Because I mistakenly believed I was entitled to these fees, I held funds for them as well."

In November 1997, the accused filed a complaint in circuit court against the Chesneys, seeking $10,441 in damages. In March 1998, Quenelle wrote to the accused's lawyer, complaining that the accused still owed his clients $1,000 in addition to the $1,575 already paid. The accused's lawyer reviewed Quenelle's letter with the accused.

According to Quenelle, the Chesneys grew tired of fighting with the accused and paying Quenelle to attempt to recover the balance of the funds to which they believed they were entitled. Quenelle testified that the Chesneys had paid him between $5,000 and $8,000 for his services in disputing the accused's fees. In June 1998, the parties reached a settlement in which the accused retained virtually the entire disputed amount. The Bar thereafter amended its complaint to

allege that the accused's conduct in the Chesney matter violated DR 1-102(A)(3), DR 2-106(A) and DR 9-101(C)(4).

## II. PROCEEDINGS BELOW

The accused did not testify at the hearing before the trial panel. Regarding the Moore matter, the accused's lawyer admitted at the hearing that, when the $500 checks started arriving, the accused had an obligation to contact Davidson to clarify the situation and that the accused's failure to do so was a "passive misrepresentation" in that the accused did not reveal information to Davidson that he was obligated to reveal. The trial panel found that, although the accused might have believed that the settlement was for $4,000, the correspondence between the accused and Davidson put the accused on notice that there was a misunderstanding as to the terms of the settlement. The trial panel concluded that the accused's conduct in the Moore matter violated DR 1-102(A)(3) by misrepresentation.

Regarding the Chesney matter, the accused's lawyer admitted that the accused billed for matters that he should not have and that he retained client funds too long. The trial panel agreed, finding that the accused violated DR 2-106(A) (excessive fee). The trial panel also found that the accused failed to return the Chesneys' file or to make it available to them for copying in violation of DR 9-101(C)(4) (duty to return client property). Regarding the amount billed that the accused eventually refunded, the trial panel found that the accused violated DR 9-101(A)(2).[1] The trial panel further found, however, that the accused did not violate DR 1-102(A)(3) (prohibiting dishonesty, fraud, deceit, or misrepresentation) regarding that amount, because the Bar did not prove that the accused was dishonest or deceitful in originally billing for those activities.

The trial panel found no violation regarding the amount billed for disputing the fee that the accused did not refund:

---

[1] DR 9-101(A)(2) provides that a lawyer may not withdraw disputed funds from a trust account as a fee until the dispute is resolved. DR 9-101(C)(4) provides that a lawyer must disburse promptly undisputed funds to the client. The Bar did not allege a violation of DR 9-101(A)(2) in its amended complaint. We conclude that the trial panel meant DR 9-101(C)(4) instead of DR 9-101(A)(2).

"As previously noted, the accused sued the Chesneys for $10,441, which included this [unrefunded] $1,100. The Chesneys have entered into a settlement, release and dismissal which has the legal effect of making that $1,100 the accused's money. The bar has cited no authority which would support the proposition that it is a violation of any disciplinary rule to retain funds which, as a result of a settlement, are, as a matter of law, the funds of the accused."

The trial panel suspended the accused for 120 days with 30 days stayed.

## III. DISCUSSION

As noted, the standard of proof in lawyer discipline proceedings is clear and convincing evidence, BR 5.2, which requires evidence establishing that the truth of the facts asserted be highly probable. *In re Johnson*, 300 Or 52, 55, 707 P2d 573 (1985).[2]

### A. *Moore*

DR 1-102(A)(3) provides that it is "professional misconduct for a lawyer to [e]ngage in conduct involving * * * misrepresentation." Under DR 1-102(A)(3), misrepresentation requires a knowing misrepresentation, which includes misrepresentation by nondisclosure. *See In re Gustafson*, 327 Or 636, 647, 968 P2d 367 (1998) (so stating); *In re Weidner*, 310 Or 757, 762 n 2, 801 P2d 828 (1990) (misrepresentation is broad term encompassing nondisclosure of material fact). Evaluating misrepresentation involves a two-part inquiry: (1) whether the lawyer knew that the lawyer's statement was a misrepresentation; and (2) whether the lawyer knew that the misrepresentation was material. *Gustafson*, 327 Or at 648. A material misrepresentation involves information that, if the decision-maker had known of it, "would or could have influenced the decision-making process significantly." *Id.* at 649. A lawyer's failure to correct a false impression created by a nondisclosure of a material fact constitutes misrepresentation under DR 1-102(A)(3). *Id.* at 651; *see also In re Boardman*, 312 Or 452, 457, 822 P2d 709 (1991) (failure to correct

---

[2] The accused contends that the trial panel committed several procedural errors that prejudiced his ability to receive a fair hearing. We have considered those procedural challenges and reject them without discussion.

false impression made by unintentional misstatement also is misrepresentation).

We conclude that the accused engaged in misrepresentation by nondisclosure. Davidson paid the accused $1,000 more than was due Moore before the accused informed Davidson that he already had paid $3,000 in full settlement according to the parties' agreement. The accused had a duty to tell Davidson that full payment had been made when he learned that the second $1,500 check had cleared or, at the latest, when Davidson offered to send more money. We conclude that the accused could not have harbored a reasonable belief that the two $500 checks were another settlement offer, because the accused had demanded $1,500 from Davidson to substitute for the amount of the insufficient-funds check. We reject as untenable the accused's later-asserted justification that he believed that the settlement amount was $4,000 rather than $3,000. We hold that the Bar has proved by clear and convincing evidence that the accused violated DR 1-102(A)(3) in the Moore matter.

B.  *The Chesneys*

■■    DR 2-106(A) provides that "[a] lawyer shall not * * * charge or collect an illegal or clearly excessive fee." A fee is excessive under the circumstances when "a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." DR 2-106(B). On this record, the accused was representing only his own interests in his fee dispute with the Chesneys and he could not properly bill the Chesneys for that time. *See In re Potts / Trammell / Hannon*, 301 Or 57, 66-74, 718 P2d 1363 (1986) (charging for firm's time spent defending fee claim constitutes charging an excessive fee); *see also In re Stauffer*, 327 Or 44, 64, 956 P2d 967 (1998) (charges for defending against Bar complaints constituted excessive fee). We hold that the Bar has proved by clear and convincing evidence that the accused violated DR 2-106(A) in the Chesney matter.

■      DR 9-101(C)(4) provides that "[a] lawyer shall * * * promptly pay or deliver to a client as requested by the client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive." We hold that the Bar has proved by clear and convincing evidence

that the accused violated DR 9-101(C)(4) when he failed to return promptly the fees that he had not earned.

■ The Bar next argues that the accused was dishonest in the Chesney matter for overcharging the Chesneys and not returning their money promptly. As noted above, DR 1-102(A)(3) prohibits dishonesty, which is conduct consistent with a disposition to lie, cheat, or defraud, and includes conduct suggesting character traits of untrustworthiness and lack of integrity. *In re Hockett*, 303 Or 150, 158, 734 P2d 877 (1987).

■ The accused asserted fees long after he knew that they were inappropriate. The accused admitted in August 1997 that he knew that he was not entitled to charge his clients additional fees for disputing his bill. Despite that realization, the accused refunded only a portion of the charges that related to time spent disputing fees. As noted, in March 1998, Quenelle wrote to the accused's lawyer and pointed out that, despite releasing the $1,575, the accused still was holding $1,000 of the Chesneys' money. The accused's lawyer reviewed that letter with him, but the accused did not withdraw his assertion that the Chesneys still owed him the unrefunded fees. At that point, his refusal to return the Chesneys' money became dishonest, in violation of DR 1-102(A)(3). Forcing the Chesneys into litigation to recover his fees and managing to force them into settlement did not cleanse the accused of his misconduct. We turn to the appropriate sanction.

## IV. SANCTION

■ ■ This court looks to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance in determining the appropriate sanction for lawyer misconduct. *In re Schaffner*, 323 Or 472, 478, 918 P2d 803 (1996). Guided by the ABA Standards, this court initially weighs three considerations in determining the appropriate sanction: the duty violated; the accused lawyer's mental state; and the actual or potential injury caused by the accused lawyer's misconduct. *In re Devers*, 328 Or 230, 241, 974 P2d 191 (1999); ABA Standard 3.0.

We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. *Devers*, 328 Or at 241; ABA Standard 3.0. Finally, we compare prior Oregon cases and the sanctions imposed in them. *Devers*, 328 Or at 241.

■ We find that the accused violated several duties. First he violated his duty to his clients to preserve their property. ABA Standard 4.1. *See also In re Kenneth W. Stodd*, 279 Or 565, 567, 568 P2d 665 (1977) ("Nothing less than the most scrupulous probity in dealing with the funds of others is compatible with admission to the practice of law."). He also violated his duty as a professional to refrain from charging improper fees. ABA Standard 7.0. In addition, the accused violated his duty to his clients and to the public to maintain personal integrity and honesty. ABA Standards 4.6 and 5.1.

We turn to the accused's mental state. The ABA Standards set out three mental states: intentional, knowing, and negligent. ABA Standards at 7. We conclude that the accused acted intentionally, *i.e.*, with a conscious objective or purpose to accomplish a particular result, in charging an excessive fee, failing to return client property promptly, misleading Davidson into paying additional funds, and dishonestly charging fees.

Moving on to injury, we note that, under the ABA Standards, injury may be actual or potential. ABA Standards at 7. We find that there was substantial actual injury in this matter. The accused never repaid Davidson or CJC the $1,000. The Chesneys had to wait months before receiving some funds, and they surrendered other funds in settlement. The accused also obstructed their access to their file.

■ The accused's misconduct implicates several ABA Standards. Suspension generally is appropriate: (1) when a lawyer knows or should know that he or she is dealing improperly with client property and causes injury to a client (ABA Standard 4.12); (2) when a lawyer knowingly deceives a client and causes injury to the client (ABA Standard 4.62); or (3) when a lawyer knowingly engages in conduct that is a violation of a duty owed as a professional and causes injury to a client, the public, or the legal system (ABA Standard 7.2).

Under the foregoing standards, a significant suspension is appropriate in this case.

■ We turn to a discussion of applicable aggravating and mitigating factors. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. ABA Standard 9.1. We find the following aggravating factors in this case: a dishonest or selfish motive (ABA Standard 9.22(b)); a pattern of misconduct (ABA Standard 9.22(c)); multiple offenses (ABA Standard 9.22(d)); refusal to acknowledge wrongful nature of conduct (ABA Standard 9.22(g)); substantial experience in the practice of law (ABA Standard 9.22(i)) (the accused has been a member of the Bar since 1982); and indifference to making restitution (ABA Standard 9.22(j)).

Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. ABA Standard 9.3. In mitigation, the accused does not have a prior record of discipline. ABA Standard 9.32(a). A witness also testified as to his good character. ABA Standard 9.32(g).

In his respondent's brief, the accused argues that he sought ethics advice from the Bar regarding his dispute with the Chesneys. According to the accused, that fact should be considered in mitigation. The ABA Standards do not accord any weight to seeking such advice. Assuming, *arguendo*, that seeking timely ethics advice from the Bar may provide mitigation in a particular case, the record in this case provides no comfort to the accused. As noted, the accused did not testify at the hearing, and the record here contains no definitive evidence of the nature or extent of any communications between the accused and the Bar in the Chesney matter. Because the record does not support the accused's argument, we give no weight to that particular claim of mitigation.

We conclude that the aggravating circumstances significantly outweigh the mitigating ones.

We find two Oregon disciplinary cases useful. First, in *In re Binns*, 322 Or 584, 910 P2d 382 (1996), this court disbarred a lawyer who lied to his clients about payments actually made to another lawyer under the clients' fee arrangement, which resulted in an excessive fee, lied to the Bar's

investigators, and supplied false documents to the Bar. In that case, the lawyer actually paid the disputed funds out of the trust account, and a conversion took place.

Second, in *In re Boothe*, 303 Or 643, 740 P2d 785 (1987), this court suspended a lawyer for six months when, *inter alia*, the lawyer refused to comply with a client's request to turn over a will, forged his client's signature on a check, and withdrew disputed funds. In that case, however, the court noted the lawyer's generally good reputation, lack of previous disciplinary action, and his cooperation with the investigating committee.

We conclude that this case more closely resembles *Boothe*. After considering the relevant factors and this court's case law, we conclude that a 180-day suspension is appropriate in this case.

The accused is suspended from the practice of law for 180 days, commencing 60 days from the date of filing of this decision.