Argued and submitted September 10, 2004, the accused is suspended from the practice of law for a period of 180 days, commencing 60 days from the date of filing of this decision February 3, 2005

# In re Complaint as to the Conduct of

## D. SCOTT SUMMER,
### *Accused.*

## (OSB 01-199; SC S50870)

105 P3d 848

Christ T. Troupis, Troupis & Summer, Meridian, Idaho, argued the cause and filed the brief for the accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

PER CURIAM

## PER CURIAM

This lawyer disciplinary proceeding involves an Idaho lawyer (the accused) also licensed to practice law in Oregon, whom the Oregon State Bar (Bar) contends attempted to recover twice for a client's injuries. The Bar's complaint alleged that the accused violated several rules of the Oregon Code of Professional Responsibility[1] and Oregon statutes or, if the choice of law provision of Oregon State Bar Rule of Procedure (BR) 1.4(b) required application of Idaho's rules, several Idaho Rules of Professional Conduct. The trial panel concluded that the accused violated Oregon Disciplinary Rule (DR) 1-102(A)(2) (committing criminal act reflecting adversely on lawyer's honesty, trustworthiness, or fitness to practice law); DR 1-102(A)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR 7-102(A)(5) (knowingly making false statements of fact in course of client's representation); and ORS 9.527(4) (authorizing sanctions for willful deceit or misconduct). The trial panel also concluded that it lacked "jurisdiction" to consider the alleged Idaho rule violations. The trial panel imposed a 30-day suspension.

The Bar sought review under ORS 9.536(1) and BR 10.1. It does not dispute the trial panel's findings, but argues that the accused's misconduct warrants at least a 180-day suspension from the practice of law. The accused maintains that he did not commit the violations alleged, but asserts that, if this court holds otherwise, the court should impose a lesser sanction in light of the applicable mitigating factors.

We review the record *de novo,* and the Bar has the burden of establishing the alleged misconduct by clear and convincing evidence. ORS 9.536(2); BR 10.6; BR 5.2. For the reasons that follow, we conclude that the accused violated DR 1-102(A)(2), DR 1-102(A)(3), and DR 7-102(A)(5)[2] and that

---

[1] The parties tried and this court has decided this proceeding under the Oregon Code of Professional Responsibility and not the new Oregon Rules of Professional Conduct that became effective on January 1, 2005.

[2] We have not considered, in addition to the Oregon disciplinary rule violations, the accused's alleged violation of ORS 9.527(4). As this court reasoned in *In re Kimmell*, 332 Or 480, 487, 31 P3d 414 (2001), further consideration of statutory violations "generally [will] not serve[ ] to enhance the sanction."

the appropriate sanction is a 180-day suspension from the practice of law.

## I. FACTS

The following facts either are undisputed or have been established by clear and convincing evidence. The accused became a member of both the Idaho and Oregon bars in April 1996. Soon thereafter, the accused assumed a heavy caseload at a high-volume personal injury law firm in Nampa, Idaho.[3] To process each case, the accused relied on support staff to obtain medical records, provide him with summaries of those records, and assemble pertinent records that supported demand letters that he drafted. In negotiating settlement with insurers, it was common firm practice and the accused's practice to instruct staff to withhold any medical records that might be adverse to a client's claim. The accused, nonetheless, retained final approval and authority over all demand letters and supporting documentation.

Michael White was one of the accused's first clients. White was involved in two unrelated automobile accidents within 11 days of each other on April 4 and 15, 1996. Neither accident was White's fault. The first accident occurred in Idaho. Immediately after the first accident, White received emergency medical treatment for face, mouth, and dental injuries; bruised ribs, knees, and shoulder; and some back and neck injuries. State Farm Mutual Auto Insurance (State Farm) insured the at-fault driver in that accident. The second accident occurred in Oregon, but involved a driver and truck from an Idaho-based company, Boise Cascade. Shortly after the second accident, White told Boise Cascade's Oregon claims adjuster that he had not been injured in that accident.

White continued receiving medical treatment for injuries sustained in the first accident, although much of that chiropractic, physical therapy, and dental care took place after the second accident occurred.

White retained the accused to represent him in his injury claim against State Farm. The accused sent a letter of

---

[3] The firm maintained, and the accused occasionally worked at, an Oregon office as well.

representation to State Farm in May 1996. After receiving the letter, State Farm learned about White's second accident with Boise Cascade, a self-insured entity. State Farm conferred with Boise Cascade more than once concerning White's second accident.

On September 20, 1996, the accused sent State Farm a demand letter describing White's injuries as, among other things, lacerated gums, loosened front teeth, violent insult to entire spinal structure, and "continued pain, soreness, and stiffness." Supporting those claims, the accused also submitted White's emergency care, medical, dental, chiropractic, and physical therapy records.

State Farm responded to the accused by inquiring about White's second accident. The accused consulted White, then replied on October 8, 1996, stating that the accused was unaware of the second accident because White had not been injured in that accident. State Farm independently assessed the value of White's injuries and settled the claim for $10,500 on October 30, 1996.

One week thereafter, on November 6, 1996, the accused sent a demand letter to Boise Cascade stating that, although White had been in an earlier accident, White "did not suffer any symptoms nor did he seek treatment until after the accident and injuries caused by [Boise Cascade]."[4] The accused further claimed that Boise Cascade caused White "neck, back, and a laceration to [the] mouth" injuries. The accused demanded $9,081 to settle White's claim. Although the accused included with his demand letter some new medical records from White's orthopedist and internist, he also submitted the same physical therapy, chiropractic, and dental records that he previously sent to State Farm.[5]

---

[4] The accused first sent that demand letter to Boise Cascade's Oregon claims adjuster in Oregon, who then forwarded the letter to Boise Cascade's principal office in Idaho.

[5] Omitted from the dental record was a chart notation marking the date of the first accident. Also included was a May 1996 emergency room record for "Michelle White." The Bar argued, but did not establish by clear and convincing evidence, that the accused either had altered the medical records directly or had knowledge of those alterations and submissions. The accused's legal assistant, who purportedly assembled the medical records, testified that she had no knowledge of the alterations or how Michelle White's records had been included with the Boise Cascade demand letter.

Because its claims adjuster reported White uninjured in the Boise Cascade accident, and because many of the submitted medical records referenced the first accident as the source of White's injuries, Boise Cascade denied White's claim, alerted State Farm, and contacted Idaho's insurance fraud investigation department.

State Farm eventually concluded that its settlement with White was appropriately valued. However, the State of Idaho criminally charged the accused and a criminal proceeding commenced in April 2001. A jury found the accused guilty of attempted grand theft by deception under the Idaho criminal code. The trial court withheld entry of the judgment and ordered probation, according to a sentencing procedure available in Idaho.

The Bar delayed its own formal proceeding against the accused at his request, pending completion of his criminal trial and appeal. Accordingly, the Bar did not file its final amended complaint until April 11, 2003, seven years after the events at issue. The parties have stipulated that the Idaho Bar also has commenced but not concluded disciplinary proceedings against the accused.

## II.   CHOICE OF LAW

■      Although not a matter of dispute between the parties, we first consider the threshold issue of choice of law. BR 1.4(b) provides:

"In any exercise of the disciplinary authority of Oregon, the rules of professional conduct to be applied shall be as follows:

"(1)   For conduct in connection with a proceeding in a court before which an attorney has been admitted to practice, either generally or for purposes of that proceeding, the rules to be applied shall be the rules of the jurisdiction in which the court sits, unless the rules of the court provide otherwise; and

"(2)   For any other conduct,

"(A)   If the attorney is licensed to practice only in Oregon, the rules to be applied shall be the Oregon Code of Professional Responsibility and the Bar Act; and

"(B) If the attorney is licensed to practice in Oregon and another jurisdiction, the rules to be applied shall be the rules of the jurisdiction in which the attorney *principally practices*; provided, however, that if particular conduct clearly has its *predominant effect* in another jurisdiction in which the attorney is licensed to practice, the rules of that jurisdiction shall be applied to that conduct."

BR 1.4(b) (emphasis added).

The accused principally practices law in Idaho. Thus, the trial panel erred when it asserted that it did not have "jurisdiction" to consider Idaho's disciplinary rule violations unless, consistently with the second clause of BR 1.4(b)(2)(B), the accused's conduct had its "predominant effect" in Oregon.[6]

Although the accused principally practiced law at his firm's Idaho office, he occasionally practiced out of its Oregon office, and he is admitted to practice in both jurisdictions. The first accident occurred in Idaho, but the second accident occurred in Oregon. Boise Cascade is principally an Idaho company, but its claims adjuster was located in Oregon. That adjuster collected accident information from White in Oregon and was the first to receive the accused's Boise Cascade demand letter.

It follows, then, that the effects of the accused's conduct were felt in both Oregon and Idaho. It could be argued that the accused's acts had approximately equal impact in each jurisdiction. However, neither party has argued for the exclusive application of Idaho's rules, and both have briefed and argued under Oregon's disciplinary rules.[7] In effect, the parties have litigated this proceeding as if the accused's acts had their predominant effect in Oregon. Where that conclusion is at least plausible, we will accept it and proceed accordingly by applying Oregon's disciplinary rules.

---

[6] The trial panel concluded that it lacked "jurisdiction" to apply Idaho's disciplinary rules, but what is at issue here is choice of law, not "jurisdiction."

[7] The Bar provided some analysis under the disciplinary rules of Idaho, but argued that Oregon's rules should apply. The accused argued against adding Idaho disciplinary rule violations to the Oregon rule violations already alleged, and he appeared to concentrate his arguments under Oregon's rules.

## III. OREGON DISCIPLINARY RULE VIOLATIONS

### A. *DR 1-102(A)(2)*

■      DR 1-102(A)(2) provides that "[i]t is professional misconduct for a lawyer to * * *[c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness[,] or fitness to practice law[.]" The court first must determine what criminal act the accused committed, then whether that act reflects adversely on the lawyer's honesty, trustworthiness, or fitness to practice law. *In re Allen*, 326 Or 107, 120-21, 949 P2d 710 (1997). For the rule to apply, the lawyer need not be convicted of the crime, nor must criminal conduct be established beyond a reasonable doubt; the Bar need only establish the criminal act by clear and convincing evidence. *In re Lawrence*, 332 Or 502, 507, 31 P3d 1078 (2001); *In re Anson*, 302 Or 446, 453-54, 730 P2d 1229 (1986).

■      Because the accused was criminally charged in Idaho, we first turn to the legal standards of Idaho Code sections 18-2403(1) and (2)(a). Under that statute, a person is guilty of theft by deception when that person (1) has the intent to deprive another of property or to appropriate it for another; and (2) wrongfully takes, obtains, or withholds property by deception.[8]

On *de novo* review, we find that the Bar established by clear and convincing evidence that the accused had the requisite intent to deprive Boise Cascade of $9,081 and attempted to do so by deception.

The accused argues that White suffered injuries in each accident and had legitimate claims against both State Farm and Boise Cascade. He further argues that, although he acted negligently in his correspondence to Boise Cascade

---

[8] Idaho Code section 18-2403 provides, in part:

"(1) A person steals property and commits theft when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof.

"(2) Theft includes a wrongful taking, obtaining or withholding of another's property, with the intent prescribed in subsection (1) of this section, committed in any of the following ways:

"(a) By deception obtains or exerts control over property of the owner[.]"

and in supervising the selection and submission of supporting medical records, he did not attempt to deceive Boise Cascade. Rather, the accused claims it was true that White suffered "no symptoms" after the first accident and that the accused never falsely asserted White had been uninjured in that accident. The accused further contends that it was true that White did not "seek any treatment until after the [Boise Cascade] accident" because most of White's medical care took place after the second accident occurred.

The accused's arguments are unconvincing. Resubmitting to Boise Cascade the same medical records previously sent to State Farm does not convey a belief that White had a legitimate claim against Boise Cascade. It conveys an intent to obtain a second recovery for the same injuries and take advantage of the timing of White's medical care. Further, the accused knew that he falsely attributed White's neck, back, and mouth injuries to the second accident. In testimony before the trial panel, the accused admitted that it was "not a completely true statement" to make such attributions. More to the point, the record is clear and convincing that the accused's statement was false.

The accused also admitted in his testimony that he made a conscious effort not to disclose anything to insurers "that would be damning to [his] client" and that he had instructed staff to select supporting medical documentation accordingly. Consciously employing such tactics in this instance evinces a clear intention to deprive Boise Cascade of money wrongfully.

Finally, even if this court were to accept the accused's distinction between symptoms and injuries, asserting to Boise Cascade that White suffered "no symptoms" after the first accident remains deceitful and untrue. White received extensive emergency room treatment after the first accident, which demonstrates the presence of both injuries and "symptoms."

We conclude that the accused attempted to deceive Boise Cascade when he falsely attributed White's neck, back, and mouth injuries to the second accident and obscured their source. We further conclude that the accused bolstered his deceit by resubmitting medical records from White's first

accident claim against State Farm. Finally, we conclude that the accused committed those acts with the intent to wrongfully deprive Boise Cascade of property. As such, the Bar established by clear and convincing evidence that the accused committed the criminal act of attempted theft by deception under Idaho law.[9]

Turning to our second inquiry under DR 1-102(A)(2), this court generally has held that theft reflects adversely on a lawyer's fitness to practice law. *See Kimmell*, 332 Or at 486. That is particularly true when the theft occurs in connection with the lawyer's practice. *See In re Morin*, 319 Or 547, 878 P2d 393 (1994) (accused lawyer disbarred after selling invalid wills and living trusts packages to clients). Here, the accused's attempted theft by deception reflects adversely on his honesty, trustworthiness, and fitness to practice law, in violation of DR 1-102(A)(2).

## B.   *DR 1-102(A)(3) and DR 7-102(A)(5)*

DR 1-102(A)(3) provides that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit[,] or misrepresentation[.]" An affirmative misrepresentation or misrepresentation by omission in violation of DR 1-102(A)(3) must be "knowing, false, and material." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001) (citations omitted). The "materiality" requirement refers to information that, "would or could significantly influence the hearer's decision-making process." *Id.* This court has explained that misrepresentations by omission involve information that the lawyer had in mind and failed to disclose and that the lawyer knows is material to the case at hand. *In re Gustafson*, 327 Or 636, 648, 968 P2d 367 (1998).

DR 7-102(A)(5) provides that "[i]n the lawyer's representation of a client * * *, a lawyer shall not * * * [k]nowingly make a false statement of law or fact."

Based on our analysis of DR 1-102(A)(2), we already have concluded that the accused engaged in conduct involving dishonesty and deceit, and did so intentionally to deprive

---

[9] Our finding is further supported by the Idaho jury's guilty verdict that the Idaho Supreme Court affirmed in *State v. Summer*, 139 Idaho 219, 76 P3d 963 (2003).

Boise Cascade of money. Similarly, we conclude that the accused made both affirmative misrepresentations and misrepresentations by omission to Boise Cascade. White suffered "symptoms" after the first accident, received most of his medical treatment for those "symptoms," and never injured his mouth in the second accident. The accused misrepresented all those facts to Boise Cascade. The accused also failed to disclose to Boise Cascade that White had recovered from State Farm for the same or similar injuries.

The accused made the above misrepresentations to Boise Cascade knowingly. The accused settled White's State Farm claim just one week before he sent his demand letter to Boise Cascade. Three weeks before that, the accused represented to State Farm that White had been uninjured in the Boise Cascade accident. We infer from those facts that the first accident was in the accused's mind when he made contrary representations to Boise Cascade and when he instructed his staff to select only those medical records that supported the purported second accident claim.

Finally, the accused's knowing and false statements concerning whether and to what extent White was injured were material. And, contrary to the accused's arguments, Boise Cascade's ultimate denial of White's claim does not alter that conclusion. As noted, materiality is not limited to circumstances in which a misrepresentation successfully misleads, but to those that "would or could significantly influence the hearer's decision-making process." *Eadie*, 333 Or at 53. Boise Cascade's claims manager testified before the trial panel that a lawyer's statements have such an influence because they can constitute "the entire basis for * * * negotiation." The accused's misrepresentations could have caused Boise Cascade to expend its resources investigating White's claim, analyzing its value, and negotiating settlement. Because the accused's statements could have influenced those decisions significantly, they were material.

By making false, knowing, and material misrepresentations to Boise Cascade, the accused violated DR 1-102(A)(3). Because the accused made knowing and false statements of fact in the course of White's representation, he also violated DR 7-102(A)(5).

## IV.  SANCTION

In determining the appropriate sanction, we consider the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), and this court's case law. *Kimmell*, 332 Or at 487-88.

### A.  *Preliminary Sanction*

■     We begin by determining a preliminary sanction under the ABA Standards. Under those standards, we examine the duty that the accused lawyer violated, his or her mental state, and the extent of the actual or potential injury that the misconduct caused.

■     Here, the accused violated his duty to the public to maintain standards of personal integrity pursuant to ABA Standard 5.1:

> "The most fundamental duty which a lawyer owes to the public is the duty to maintain the standards of personal integrity upon which the community relies. The public expects the lawyer to be honest and to abide by the law; public confidence in the integrity of officers of the court is undermined when lawyers engage in illegal conduct."

ABA Standards at 36.

The mental state of the accused was intentional. An intentional state of mind represents a "conscious objective or purpose to accomplish a particular result." ABA Standards at 17 (defining "intent"). The facts establish that the accused had the conscious objective to obtain a second recovery for his client's injuries.

Finally, the accused's conduct caused potential injury to Boise Cascade. Had Boise Cascade paid White's claim as demanded, it would have been injured by paying an unwarranted $9,081 claim.

A preliminary sanction of disbarment is warranted when a lawyer engages in (1) serious criminal conduct involving misrepresentation, fraud, misappropriation or theft as an element; or (2) engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that

"seriously [and] adversely reflects on the lawyer's fitness to practice" law. ABA Standards 5.11(a), (b). Because the accused's attempted theft by deception involves serious criminal conduct, disbarment is warranted as a preliminary sanction.

B. *Aggravating and Mitigating Factors*

We next consider the applicable aggravating and mitigating factors. Referring to ABA Standard 9.22, the Bar agrees with the trial panel regarding the following aggravating factors: (1) the accused acted with a dishonest or selfish motive; and (2) the accused committed multiple offenses. ABA Standards 9.22(b), (d). The accused argues against a finding of selfish motive because his percentage of any recovery from Boise Cascade would have been minimal. The accused further argues that he has not committed multiple offenses, but rather that he committed one bad act that has been charged under multiple rules. We agree with the accused in part. The accused has not committed multiple violations by engaging in multiple acts. However, for the reasons already discussed, we find that the accused acted with a dishonest motive pursuant to ABA Standard 9.22(b).

The Bar agrees that the trial panel correctly found the following mitigating factors under ABA Standard 9.32: (1) the accused has no prior disciplinary record; and (2) the accused was inexperienced in the practice of law. ABA Standards 9.32(a), (f). On *de novo* review, we also agree. In addition, we further find that Idaho's past and pending imposition of other criminal penalties and disciplinary sanctions is a third mitigating factor. ABA Standard 9.32(k); *See also In re Page*, 326 Or 572, 579-80, 955 P2d 239 (1998) (imposition of bar discipline from another jurisdiction is mitigating factor). We will not consider as mitigating the significant seven-year delay in bringing this disciplinary proceeding, because the accused contributed to that delay by choosing to focus on his criminal trial and appeal. ABA Standard 9.32(i); *cf. In re Jones*, 326 Or 195, 201, 951 P2d 149 (1997) (delay in disciplinary proceeding may operate as mitigating factor when lawyer does not contribute to delay).

## C. *Oregon Case Law*

Finally, in determining an appropriate sanction, this court examines the accused's conduct in light of our prior case law. The Bar argues that a 180-day suspension from the practice of law is warranted under the following line of cases involving fraud and theft: *Kimmell*, 332 Or 480 (180-day suspension for Class A misdemeanor theft of jacket); *In re Benson*, 317 Or 164, 854 P2d 466 (1993) (180-day suspension after recording fraudulent encumbrance to deter forfeiture proceedings on client's property); *In re Benett*, 331 Or 270, 14 P3d 66 (2000) (180-day suspension after receiving and then refusing to refund opposing counsel's inadvertent duplicate payment).

In cases involving fraud, theft, or misrepresentation, this court has imposed a range of sanctions depending on the nature and type of theft or misrepresentation. This court has stated that "theft from a client is the most egregious form of theft that can be committed by a lawyer and generally warrants disbarment." *See Kimmell*, 332 Or at 490 (*citing In re King*, 320 Or 354, 883 P2d 1291 (1994) (so stating); *In re Phelps*, 306 Or 508, 520, 760 P2d 1331 (1988) (when lawyer "steals funds from a client, the sanction is disbarment" despite mitigating factors); *In re Pierson*, 280 Or 513, 518, 571 P2d 907 (1977) (single conversion of client funds will result in disbarment)).

On the other hand, this court's cases also demonstrate that theft from someone other than a client that occurs outside the practice of law generally will not result in disbarment or a lengthy suspension. *Id.* at 490-91 (*citing In re Mahr*, 276 Or 939, 556 P2d 1359 (1976) (90-day suspension for theft of plug socket from store)); *In re Carstens*, 297 Or 155, 683 P2d 992 (1984) (public reprimand for conversion of wife's joint ownership interest in vehicle)).

Although this court distinguishes between those thefts resulting in harm to a client and those that do not, this court takes seriously any theft and misrepresentation that occurs within the practice of law. *See In re Huffman*, 331 Or 209, 13 P3d 994 (2000) (two-year suspension for misrepresentations in motions filed with court).

In *Benson*, this court imposed a 180-day suspension when a lawyer violated DR 1-102(A)(3), DR 7-102(A)(5), and two other disciplinary rules. 317 Or at 166, 168. That accused lawyer filed fraudulent encumbrances on his client's property with the intent to assist the client in illegally interfering with the property's impending forfeiture. *Id.* at 166-67. Although that accused lawyer had only one prior disciplinary violation, the "significant and ongoing potential for harm to the criminal justice system" warranted this court's imposition of a 180-day suspension from the practice of law. *Id.* at 170-71.

In *Benett*, that accused lawyer violated DR 1-102(A)(3) when he received and retained a second payment made by opposing counsel after a first payment failed to clear the bank. 331 Or at 272-73. That accused lawyer ultimately retained both payments when opposing counsel reissued a second check and the bank cleared the first check. *Id.* That accused lawyer failed to notify opposing counsel that the first check had cleared and later represented to opposing counsel that the overpayment settled an additional claim against the client in question. *Id.* at 273. This court imposed a 180-day suspension, because that accused lawyer committed multiple offenses and because several aggravating factors applied. *Id.* at 281-82.

Here, the accused committed a criminal act within the practice of law, as did the accused lawyer in *Benson*, and acted with dishonesty within the practice of law, as did the accused lawyer in *Benett*. Notwithstanding mitigating factors, we conclude that a 180-day suspension from the practice of law is the sanction most consistent with our past treatment of similar misconduct.

The accused is suspended from the practice of law for a period of 180 days, commencing 60 days from the date of filing of this decision.